UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RAYMOND A. LONG, M.D.,           :
                                 :
        Plaintiff,               :
                                 :
        v.                       :   Case No. 2:13-cv-189
                                 :
QUORUM HEALTH RESOURCES, LLC,    :
and NORTHWESTERN MEDICAL         :
CENTER, INC.,                    :
                                 :
        Defendants.              :

## OPINION AND ORDER

Plaintiff Raymond A. Long, M.D. alleges that Defendants
Quorum Health Resources, LLC ("QHR") and Northwestern Medical
Center, Inc. ("NMC") are liable for statements made to the United
States Department of Health and Human Services ("HHS") regarding
his professional performance.  Defendants now move to dismiss the
First Amended Complaint ("FAC") pursuant to Fed. R. Civ. P.
12(b)(6), arguing res judicata and failure to state a claim.[1]
Defendants also oppose Dr. Long's motion for leave to file a
Second Amended Complaint.  For the reasons set forth below,
Defendants' motion to dismiss is GRANTED, Dr. Long's motion for
leave to amend is DENIED, and this case is DISMISSED.

## Factual Background

In September 2001, Dr. Long was granted privileges to

---

[1] Although Defendants filed their motion to dismiss prior to
the docketing of the FAC, they did not oppose the filing of the
FAC and have asked the Court to apply their arguments to the
claims set forth therein.  ECF 31 at 1 n.1.  The FAC incorporates
by reference documents attached to the original complaint.

practice as a surgeon at NMC.[2]  He claims that in 2003, someone at NMC deliberately contaminated several of his surgeries with bacteria, thereby causing infections in his patients.  NMC subsequently arranged for a peer review process, in part to investigate Dr. Long's allegations.  As a result of this process, NMC issued an order prohibiting Dr. Long from performing any further surgeries until he had been evaluated by a psychiatrist. The order also advised him of his right to a hearing.  Dr. Long resigned the following day, allegedly to avoid further "inexcusable danger to his patients."  ECF 41 at 6, ¶ 38.

On April 30, 2004, NMC submitted an Adverse Action Report ("AAR") to the National Practitioner Data Bank ("NPDB"), stating that Dr. Long had voluntarily surrendered his clinical privileges at NMC "while under, or to avoid, investigation relating to professional competence or conduct."  *Id.* at 7, ¶ 42.  Pursuant to federal law, health care entities are required to report to the NPDB all surrenders of clinical privileges "[w]hile the physician or dentist is under investigation by the entity relating to possible incompetence or improper professional conduct."  42 U.S.C. § 11133(a)(1)(B)(i).  The NPDB can be queried when a doctor seeks to obtain employment or privileges at a hospital or other health care entity.  *See* 42 U.S.C. § 11137.

_____

[2] Dr. Long alleges that NMC is managed by QHR, and that QHR is vicariously liable for the NMC's actions or omissions.

Dr. Long contends that the report to the NPDB was unjustified.  He claims that instead of conducting an investigation for the purpose of furthering quality health care, NMC undertook the peer review process "to blame Plaintiff for the deliberately caused infections and to cast him as mentally unstable."  ECF 41 at 7, ¶¶ 39-41.  Accordingly, he argues, the process did not constitute an "investigation" as defined by the the Health Care Quality Improvement Act, and no report to the NPDB was required.

On August 29, 2011, Dr. Long wrote to NMC requesting that the AAR be "removed."  ECF 1-2 at 2.  When NMC declined, Dr. Long sought review by the Secretary of HHS (the "Secretary").  In a letter dated December 2, 2011, the Secretary acknowledged receipt of Dr. Long's request and notified him that it might require additional information either from him or "the entity that filed the report under review."  The Secretary also explained that the scope of review was limited, as it would only determine "(1) if the report is legally required or permitted to be filed and (2) if the report accurately depicts the action taken and the reporter's basis for the action *as reflected in the written record.*"  The Secretary further informed Dr. Long that if he claimed "the reporting entity was wrong to take action," or "acted unfairly," those issues were outside the scope of review, and a statement would be added to the report noting the

Secretary's limited jurisdiction, as well as its findings.  *Id.*
at 10-11.  The December 2, 2011 letter also notified Dr. Long of
his right to withdraw his request for review.

On December 20, 2011, the Secretary asked NMC to provide
additional information.  Specifically, NMC was asked to "share
with us the sequence of events that led Northwestern to report
Dr. Long to the NPDB, and provide copies of documentation to
support your explanation."  *Id.* at 13.  On January 31, 2012, NMC
Chief Executive Officer Jill Berry Bowen replied with a brief
cover letter, a two-page chronology of events that occurred
between March 8 and April 30, 2004, and supporting documentation
from that same time period (the "Bowen Response").  The cover
letter stated as follows:

> The following submission on behalf of Northwestern
> Medical Center with respect to the above matter is made
> in response to your letter to Kim Charboneau dated
> December 20, 2011.
>
> Pursuant to your request, I am submitting the enclosed
> document entitled *Sequence of Events that Led
> Northwestern Medical Center to Report Dr. Long to the
> NPBD (With References to Attached Documentation)*.  I
> believe that these materials suffice to establish that
> Dr. Long resigned during a pending investigation, but
> please do not hesitate to contact me if you have
> lingering questions or require additional materials.

*Id.* at 15.  The chronology set forth the date and a brief
description of events and attached documents.  Those documents
included correspondence within NMC, correspondence to Dr. Long,
Dr. Long's resignation letter, and the AAR.

4

Dr. Long alleges that the Bowen Response "went far beyond the original submission to the NPDB." ECF 41 at 8, ¶ 48. The FAC contends that "a reasonable reader would reasonably understand" statements in the Bowen Report to be asserting: that the peer group review constituted an "investigation" as defined by the NPDB Guidebook and federal law; that the peer group itself was a "peer review committee" as defined by Vermont law and a "peer review organization" as defined by federal law; that Dr. Long was emotionally unstable because he contended that there was a criminal conspiracy against him that in fact did not exist; that Dr. Long's conspiracy theory was evidence of psychiatric problems; and that Dr. Long resigned from the hospital because he did not want to submit to a psychiatric examination. Dr. Long alleges that NMC knew each of those statements to be false and fraudulent, and intended "to ensure that the Secretary would not cause the [AAR] to be removed from the NPDB." ECF 41 at 11, ¶ 57.

By letter dated February 27, 2012, Dr. Long was notified by the Secretary that as result of its review, it was "denying your dispute" and the AAR would remain in the NPDB. ECF 1-2 at 30. In support of its determination, the Secretary found that Dr. Long was the subject of an ongoing professional review process at the time of his resignation, and that the AAR was properly filed. A notation was thus added to the AAR stating that "the Secretary

determined that there is no basis to conclude that the report should not have been filed or that for agency purposes it is not accurate, complete, timely or relevant.  Accordingly, the report shall be maintained as submitted by the reporting entity." ECF 1-3 at 3.

The current action centers on the Bowen Report and the revised AAR, claiming libel per se and tortious interference with prospective business relationships.  Count One of the FAC asserts that the statements in the Bowen Response were malicious and caused the NPDB to maintain the revised AAR containing the Secretary's notation.  Count One also claims that the revised AAR was provided to all potential employers who queried the NPDB, thus costing Dr. Long over one year's income.  Count Two contends that NMC knew, or should have known, that it could decline the Secretary's request for additional information, and that this would have resulted in the original AAR being removed from the NPDB.  Instead, NMC submitted allegedly-false statements, thereby interfering with Dr. Long's ability to secure employment.

### Related Litigation

In 2005, Dr. Long filed an action in this Court against QHR, NMC, and others who were affiliated with NMC and/or involved in the 2004 peer review process.  *See Long v. Quorum Health Resources, LLC et al.*, No. 2:05-cv-21 (the "2005 Case").  The 2005 Case included allegations regarding NMC's investigation of

Dr. Long's claims and behaviors, the recommendations that arose out of that investigation, and the adoption of those recommendations by NMC's Medical Executive Committee and CEO. Causes of action asserted in the 2005 Case included libel and tortious interference.  That litigation concluded with a settlement and a stipulation of dismissal with prejudice in 2008.

Concurrent with the settlement, Dr. Long signed a general release of all claims.  The release applied to a host of parties, including the defendants, their successors and assigns, and insurer Medical Mutual Insurance Company of Maine.  The terms of the release covered any claims "that [Dr. Long] made or could have made," including those "of which [he was] totally unaware and unsuspecting," excepting only claims under Dr. Long's medical malpractice insurance policies, "up to and as of the date" the release was signed.  ECF 37-1 at 1.  The settlement agreement did not require removal of the AAR from the NPDB.

In 2012, Dr. Long filed suit against Lloyd Parry, Esq. and his law firm, Davis, Parry & Tyler, P.C.  *See Long v. Parry*, No. 2:12-cv-81 (the "Parry Case").  Attorney Parry represented Dr. Long in the 2005 Case.  Dr. Long claims Parry defied his instructions and negotiated a settlement that did not require NMC to void the AAR.  Dr. Long also claims that Parry threatened to withdraw if Dr. Long did not accept the $4,000,000 settlement. The Parry Case is currently pending.

7

**Discussion**

I.   **Motion to Dismiss**

A.   **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  Furthermore, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In its review, the Court may consider facts alleged in the complaint and documents attached to it or incorporated in it by

8

reference, documents "integral" to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("[F]or purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . ."); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (in determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken).

**B.  Libel Per Se Claim**

1.  Res Judicata

Defendants first argue that the doctrine of res judicata bars Dr. Long's claims.  Specifically, they contend that the libel and tortious interference claims brought in the 2005 Case may not be raised again here, even though they are based upon communications that occurred after the 2005 Case was settled. Because this Court exercised diversity jurisdiction over the state law claims alleged in the 2005 Case, it applies Vermont's res judicata jurisprudence.  *See Taylor v. Sturgell*, 553 U.S. 880, 891 n.4 (2008) ("For judgments in diversity cases, federal

law incorporates the rules of preclusion applied by the State in which the rendering court sits."); *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001).

The doctrine of res judicata "bars the litigation of a claim or defense if there exists a final judgment in former litigation in which the 'parties, subject matter and causes of action are identical or substantially identical.'" *Berlin Convalescent Ctr., Inc. v. Stoneman*, 615 A.2d 141, 143 (Vt. 1992) (quoting *Berisha v. Hardy*, 474 A.2d 90, 91 (Vt. 1984)).  Res judicata precludes parties from litigating claims that were raised in previous adjudicative proceedings as well as those that should have been raised.  *Lamb v. Geovjian*, 683 A.2d 731, 734 (Vt. 1996); *see also Iannarone v. Limoggio*, 2011 VT 91, ¶ 15, 30 A.3d 655, 660 (explaining that a claim will be barred from being litigated if "(1) a previous final judgment on the merits exists, (2) the case was between the same parties or parties in privity, and (3) the claim has been or could have been fully litigated in the same proceeding." (quoting *In re St. Mary's Church Cell Tower*, 2006 VT 103, ¶ 3, 910 A.2d 925, 926 (mem.)).

Here, there is no dispute that the 2005 Case constituted a final adjudication on the merits involving the same parties.  The application of res judicata, also known as claim preclusion, thus hinges upon whether the subject matter and causes of action are the same or substantially the same.  *Stoneman*, 615 A.2d at 143.

The pleadings in the 2005 Case asserted a libel claim based upon NMC's statements and actions.  The Amended Complaint alleged that "the forced resignation of Dr. Long from NMC and related matters have been communicated by Defendants to other physicians, hospitals, patients and individuals."  2005 Case, ECF 197-2 at 28-29, ¶ 583.  The Amended Complaint also alleged that "Defendants allowed information regarding Dr. Long's peer review to be published to various persons not participating in the peer review such that Dr. Long has been labeled as emotionally disturbed and unfit to practice his profession."  *Id.* at ¶ 584. The 2005 Case further claimed that "notification to the [NPDB] has now and forever falsely and maliciously branded Dr. Long as a 'problem doctor.'  As such, Dr. Long's ability to obtain employment elsewhere in the United States as an orthopedic surgeon has been virtually eliminated."  *Id.* at ¶ 47.

Dr. Long's current libel claim centers upon the Bowen Report and the revised AAR.  The Bowen Report consisted primarily of documentation pertaining to the 2004 peer review investigation and Dr. Long's resignation, much of which was the subject of the 2005 Case.  The only new documents generated in the Bowen Report were the cover letter and the chronology.  As noted above, the chronology set forth the dates and brief descriptions of events and supporting documents.  Those descriptions used the term "investigation," but did not make any statements about Dr. Long's

11

emotional stability or the reason for his resignation.  ECF 1-2 at 16-17.

Dr. Long asserts that the submission of peer review documents to HHS, and republication of the AAR to the NPDB, both constituted new acts of defamation, and that he has suffered new damages as a result of NMC's refusal to withdraw the AAR.  He is also in possession of a new expert report that allegedly supports his contamination claim.

Defendants respond that pursuant to a "transactional test," the support for both this case and the 2005 Case is fundamentally the same and res judicata applies.  *See Faulkner v. Caledonia Cnty. Fair Ass'n*, 2004 VT 123, ¶¶ 12-13, 869 A.2d 103, 108-09 (discussing "transactional test"); *see also State v. Dann*, 702 A.2d 105, 109 (Vt. 1997) (holding that for purposes of res judicata, "two causes of action are the same if they can be supported by the same evidence").  In *Faulkner*, the Vermont Supreme Court explained and endorsed the "transactional test," noting a trend toward a "broader approach" to preclusion claims. 2004 VT 123, ¶ 12, 869 A.2d at 108.[3]

In determining whether two causes of action are sufficiently similar for claim preclusion purposes,

---

[3] *Faulkner* involved a plaintiff who suffered a head injury while on an amusement park ride.  Plaintiff filed suit and collected damages, but years later filed suit again after suffering epileptic seizures as a result of the same head injury. The lower court dismissed the case on the basis of claim preclusion, and the Vermont Supreme Court affirmed the judgment.

this Court has focused on whether the same evidence
will support both of them . . . .

As the U.S. Supreme Court has noted, however,
"[d]efinitions of what constitutes the 'same cause of
action' have not remained static over time." 2004 VT
123, ¶ 12, 869 A.2d 108. Indeed, the trend has been
toward a broader approach, embodied in the Restatement
(Second) of Judgments, requiring a plaintiff to address
in one lawsuit all injuries emanating from "all or any
part of the transaction, or series of connected
transactions, out of which the action arose."
Restatement (Second) of Judgments § 24(1)(1982)
[hereinafter Restatement (Second)]; . . .

Under the second Restatement, the scope of a
"transaction" is determined by "giving weight to such
considerations as whether the facts are related in
time, space, origin, or motivation, whether they form a
convenient trial unit, and whether their treatment as a
unit conforms to the parties' expectations or business
understanding or usage." Restatement (Second) § 24(2).
In making this assessment, "no single factor is
determinative." *Id.* § 24 cmt. b. Additionally, "even
when there is not a substantial overlap [between proofs
relevant to two actions], the second action may be
precluded if it stems from the same transaction." *Id.*
Thus, it follows from this flexible definition that
"where one act causes a number of harms to, or invades
a number of different interests of the same person,
there is still but one transaction." *Id.* § 24 cmt. c.

*Id.* at ¶¶ 12-13, 869 A.2d at 108-09; *see also Woods v. Dunlop
Tire Corp.*, 972 F.2d 36, 38 (2d Cir. 1992) (applying
transactional analysis under federal res judicata doctrine).

With respect to allegations of new damages, *Faulkner* again
cited "the Restatement approach [which] recognizes, 'even when
the injury caused by an actionable wrong extends into the future
and will be felt beyond the date of judgment, the damages awarded
by the judgment are nevertheless supposed to embody the money

equivalent of the entire injury.'"  *Id.* at ¶ 16, 869 A.2d at 110
(quoting Restatement (Second) of Judgments § 25 cmt. c).  Whether
the plaintiff was "'in possession of enough information about the
damages, past *or prospective*'" is "'immaterial' to the claim
preclusion analysis."  *Id.*

Dr. Long alleges that he has suffered new damages because
the AAR was "maintained" in the NPDB.  The resolution of the 2005
Case, however, pertained to both past and prospective damages
claims arising out of the AAR as it existed in 2008.
Accordingly, any damages arising out of its "maintenance" are
barred.  *See id.*

Dr. Long also submits that he has new, "far stronger
evidence that NMC was negligent in defaming Dr. Long."  ECF 24 at
18.  This evidence consists of an expert report allegedly
demonstrating "that someone was deliberately infecting Dr. Long's
patients."  *Id.*  Dr. Long does not explain why such a report was
not generated for use in the 2005 Case.  "Relitigation of an
issue with additional evidence that was previously available, as
occurred here, is precisely what res judicata and collateral
estoppel are intended to prevent."  *In re McGrew*, 2009 VT 44, ¶
13, 974 A.2d 619, 624.  Dr. Long's new evidence thus does not
prevent the application of res judicata to his current libel
claim.

Some of Dr. Long's claims are based upon facts and

14

statements that did not exist at the time of the 2008 settlement; specifically, the Bowen cover letter and chronology, and the Secretary's notation on the AAR.  Dr. Long also appears to allege that each query to the NPDB constitutes a republication.

Several courts have "applied res judicata to claims extending over time or involving seriatim transactions and events so long as they are sufficiently related . . . .  [T]he pleading of subsequent acts will not defeat res judicata when these additional facts arise from the same core of operative facts." *Waldman v. Village of Kiryas Joel*, 39 F. Supp. 2d 370, 379 (S.D.N.Y. 1999) (citing *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 638 (2d Cir. 1989)), *aff'd*, 207 F.3d 105 (2d Cir. 2000).  Here, any injuries arising out of post-2008 queries to the NPDB by, for example, Dr. Long's potential employers, clearly arose out of the same core of operative facts as the settled claims and are not actionable.  As to any injuries caused by the Secretary's notation on the AAR, or by the Bowen Report, those events also arose out of the same core of facts as the 2005 Case.

Indeed, applying the "transactional test" criteria of "time, space, origin, or motivation," the documents provided in the Bowen Report originated during the 2004 peer review process and pertained to the same "time" and "space" as the facts underlying the 2005 case.  *Faulkner*, 2004 VT 123, ¶ 13, 869 A.2d at 109 (noting "flexible definition" of claim preclusion).  With respect

15

to motivation, the alleged publications to the NPDB, and subsequently HHS, arose out of NMC's perceived obligation to provide information about pre-2005 conduct.  And as to the parties' expectations, *see id.*, there would have been no expectation that the 2004 documents or related information would be submitted to HHS if not for the Secretarial review that Dr. Long himself initiated.  Dr. Long's libel claim is therefore DISMISSED as barred by res judicata.

2.   Invited Harm

Defendants submit, in the alternative, that any harm suffered as a result of the Secretary's review was brought on by Dr. Long himself.  The Restatement (Second) of Torts posits that "the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation."  Restatement (Second) of Torts § 583 (1977).  Indeed, "[i]t is axiomatic that 'invited defamation,' or the issuance of a defamatory statement wherein the injured party precipitated the statement's release, is not actionable."  *Litman v. Massachusetts Mut. Life Ins. Co.*, 739 F.2d 1549, 1560 (11th Cir. 1984); *see also Georgia Power Co. v. Busbin*, 289 S.E.2d 514, 515 (Ga. 1982) (holding that there can be no recovery for invited libel); *Pressley v. Continental Can Company*, 250 S.E.2d 676, 678, *disc. review denied*, 254 S.E.2d 37, 37-38 (N.C. 1979) ("A publication of a libel, procured or invited by the plaintiff, is

not sufficient to support an action for defamation."); *Williams v. School Dist. of Springfield*, 447 S.W.2d 256, 269 (Mo. 1969) ("One who has invited or instigated the publication of defamatory words can not be heard to complain of the resulting damage to his reputation."), *overruled on other grounds by Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo. 1983).[4]

In Dr. Long's opposition to the motion to dismiss, counsel submits that Dr. Long did not compel either the Bowen Report or the Secretary's notation, as he expected NMC to either withdraw the AAR or to remain silent when the Secretary requested supporting documentation.  ECF 24 at 5.  This assertion is belied by the exhibits submitted with his pleadings.

Dr. Long's exhibits show that on August 29, 2011, he wrote to NMC's Bowen and informed her that "[t]he National Practitioner Data Bank requires that a practitioner attempt to resolve [the AAR issue] with the reporting entity prior to elevating the matter to review by the Secretary of [HHS].  Please advise if [NMC] will voluntarily void this report."  ECF 1-2 at 2.  Bowen responded in writing on September 9, 2011, stating that "the Medical Center declines to void the report."  *Id.* at 3.  Dr. Long then submitted his formal request to the Secretary, asserting

---

[4] While consent is an affirmative defense, it may be raised in a Rule 12(b)(6) motion if the factual bases for the defense appear on the face of the complaint.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425–26 (2d Cir. 2008).

17

that NMC "should be required to produce acceptable evidence
supporting the referenced AAR." *Id.* at 6.

As discussed above, the Secretary confirmed receipt of Dr.
Long's request, and notified him that it might contact "the
entity that filed the report under review" and request
"additional information." *Id.* at 10.  The Secretary also warned
Dr. Long that its findings would be set forth in a statement
"added to the [AAR]." *Id.* at 11.  Accordingly, Dr. Long was on
notice that his request for review could precipitate both the
Bowen Report and the Secretary's subsequent statement on the AAR.
Indeed, in light of NMC's refusal to void the AAR, and even if
the Court draws all reasonable inferences in Dr. Long's favor,
*see LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471,
475 (2d Cir. 2009), the complaint and its attachments show that
both the Bowen Report and a revised AAR were likely outcomes.
*See, e.g., Busbin*, 289 S.E.2d at 515 ("It is enough that the
complainant requests or consents to the presence of a third party
and solicits the publication of matter which he knows or has
reasonable cause to suspect will be unfavorable to him.").

This case would not exist but for Dr. Long's request for
review by the Secretary.  In the course of that process, Dr. Long
urged the Secretary to require documentation from NMC, the
Secretary did so, and NMC complied.  That compliance, resulting
from Dr. Long's own actions, cannot now result in liability and a

18

second payment of damages.  Accordingly, for this reason as well, the libel per se claim against Defendants is DISMISSED.

### C.  Tortious Interference Claim

Dr. Long's tortious interference claim is similarly barred. The 2005 Case alleged that as a result of the AAR, Dr. Long was unable to obtain employment as a surgeon.  He now claims that the revised AAR again prevents him from obtaining employment, and that when the 2005 Case was settled, he did not have the benefit of the expert report regarding contamination.  Dr. Long further contends that Defendants' failure to remain silent when asked by the Secretary for documentation caused him new harm.

Again applying the "transactional test" for res judicata, the Court finds that most of the facts supporting Dr. Long's 2005 tortious interference claim are fundamentally the same as those offered here.  A tortious interference claim requires a plaintiff to show, among other things, "that the interferer acted with the purpose to harm the plaintiff or by means that are dishonest, unfair, or improper."  *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 21, 6 A.3d 701, 709.  The Bowen Report and the updated AAR were based upon documents from 2004, and to the extent the 2004 documents might have satisfied the tortious interference standard, that issue was put to rest in the 2008 settlement.

Insofar as the tortious interference claim is based upon a core of operative facts beyond the 2004 documents, the actions

19

complained of were again the product of Dr. Long's own request to
the Secretary.  His claim that NMC should have remained silent is
misplaced, as NMC was entitled, and arguably compelled, to
respond to the Secretary's request.  Indeed, the Secretary's
letter to Kim Charboneau at NMC stated that "[a] response is
required in accordance with the reporting requirements of the
Health Care Quality Improvement Act of 1986, as amended, 42
U.S.C. §§ 11101 *et seq*."  ECF 1-2 at 14.  Those reporting
requirements may have included sanctions for failure to report.
*See, e.g.,* 42 U.S.C. § 11133©.  Furthermore, Dr. Long knew that
NMC stood behind both its investigation and its AAR report, and
had no reason to expect that NMC would remain silent when
questioned about those events.

     With respect to the updated AAR, the Secretary added a
comment as the result of the review process initiated by Dr.
Long.  Dr. Long cannot now benefit from the outcome of his own
actions.  Nor does the existence of a new expert report
revitalize his claim since, as discussed above, the facts
underlying that report were available prior to the conclusion of
the 2005 Case.  Dr. Long's tortious interference claim is
therefore DISMISSED.

### III. Motion to Amend

     Dr. Long has moved to amend the FAC to add two new causes of
action: violation of Vermont's consumer fraud statute (Count III)

and deceit (Count IV).  He also seeks to add Medical Mutual
Insurance Co. of Maine ("MMIC") as a defendant.  MMIC allegedly
provided counsel for Defendants in the 2005 Case, as well as the
funds to settle that case.  Dr. Long claims that MMIC
fraudulently induced him to settle by failing (through its hired
attorneys) to provide certain discovery in the course of the 2005
Case.

In general, courts should freely give leave to amend "when
justice so requires."  Fed. R. Civ. P. 15(a)(2); *see Foman v.
Davis*, 371 U.S. 178, 182 (1962).  "Leave to amend, though
liberally granted, may properly be denied for: 'undue delay, bad
faith or dilatory motive on the part of the movant, repeated
failure to cure deficiencies by amendments previously allowed,
undue prejudice to the opposing party by virtue of allowance of
the amendment, futility of amendment, etc.'"  *Ruotolo v. City of
New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman*, 371
U.S. at 182).  If the amended claims could not withstand a motion
to dismiss pursuant to Rule 12(b)(6), leave to amend may be
denied.  *See Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258
(2d Cir. 2002); *Dougherty v. Town of N. Hempstead Bd. of Zoning
Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).  As with a Rule 12(b)(6)
motion, the Court accepts all factual allegations in the proposed
amendments as true and draws all reasonable inferences in favor
of the plaintiff.  *See Aetna Cas. & Sur. Co. v. Aniero Concrete*

*Co., Inc.*, 404 F.3d 566, 604 (2d Cir. 2005).

In support of his amended claims, Dr. Long alleges that on December 23, 2003, a patient upon whom he had operated came to his office suffering from a post-surgical infection.  Before commencing antibiotic treatment, Dr. Long obtained a bacterial culture from the patient.  He now contends that the December 23 culture result was not produced during discovery in the 2005 Case, and if produced, would have helped him prove that NMC was contaminating his surgeries.

Specifically, Dr. Long discovered in July 2013 that the December 23 culture "demonstrated an infection with Staphylococcus aureus that was sensitive to all antibiotics." ECF 32-1 at 17, ¶ 115.  He asserts that such an infection "is rarely if ever seen in the clinical practice of medicine," because bacteria within a hospital environment rapidly develops antibiotic resistance.  *Id.* at 16-17, ¶¶ 103, 116.  Bacteria from a biological supply house, however, "is not exposed to factors that result in antibiotic resistance." *Id.* at 16, ¶ 102.  Dr. Long alleges that the December 23 culture matched bacteria purchased by NMC, presumably from a supply house, shortly prior to the patient's surgery.  *Id.* at 17, ¶ 118.

A culture taken from the same patient the next day (December 24, 2003), after the bacteria had begun to develop antibiotic resistance, did not match the purchased bacteria.  Dr. Long

22

alleges that while the defendants produced the December 24 culture, they intentionally withheld the December 23 culture, and access to the latter culture would have helped him prove contamination.  Such proof, he claims, would have resulted in either a settlement amount or a jury verdict in excess of the $4,000,000 settlement he achieved in 2008.

Based upon these factual allegations, Dr. Long first seeks to add a cause of action under the Vermont Consumer Fraud Act ("VCFA").  The VCFA prohibits "unfair or deceptive acts or practices in commerce."  Vt. Stat. Ann. tit. 9, § 2453(a).  To bring a claim under the VCFA, a plaintiff must be a consumer who "contracts for goods or services."  Vt. Stat. Ann. tit. 9, § 2461(b).  The defendant must be a "seller, solicitor, or other violator."  *Id.*

The "'in commerce' requirement narrows the CFA's application to prohibit only unfair or deceptive acts or practices that occur in the consumer marketplace.  To be considered 'in commerce,' the transaction must take place in the context of an ongoing business in which the defendant holds himself out to the public."  *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 21, 59 A.3d 744 (internal quotation marks and citation omitted).  In *Foti Fuels*, the Vermont Supreme Court further explained that to be considered "in commerce":

> the practice must have a potential harmful effect on
> the consuming public, and thus constitute a breach of a

> duty owed to consumers in general.  By contrast,
> transactions resulting not from the conduct of any
> trade or business but rather from private negotiations
> between two individual parties who have countervailing
> rights and liabilities established under common law
> principles of contract, tort and property law remain
> beyond the purview of the statute.

*Id.* (internal quotation marks and citations omitted).

Here, the underlying facts do not fall within the purview of the VCFA.  Dr. Long was not a consumer as defined by the statute, as he did not contract for either a good or a service from MMIC.  Furthermore, the settlement of the 2005 Case was not a transaction that took place "in commerce," but instead involved private parties with "countervailing rights and liabilities established under common law."  *Id.; see also Bennet v. Ford Motor Co.*, 2008 WL 4000558, at *3 (W.D. Ky. Aug. 25, 2008) (denying claim under Kentucky Consumer Fraud Act where defendant's allegedly wrongful acts "took place in the conduct of litigation, not in the conduct of trade or commerce").  Dr. Long's proposed claim under the VCFA is therefore futile.

His second proposed cause of action is for "deceit." Under Vermont law, "'[a]n action for fraud and deceit will lie upon an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to his damage.'"  *Silva v. Stevens*, 589 A.2d 852,

24

857 (Vt. 1991) (quoting *Union Bank v. Jones*, 411 A.2d 1338, 1342 (Vt. 1980)).  The deceit claim is again based upon the alleged failure to produce the December 23 culture.

The fundamental flaw in this proposed claim is that Dr. Long allegedly obtained the December 23 culture himself.  Accordingly, he knew that the culture had been analyzed, and its omission from discovery production was "open to the defrauded party's knowledge."  *Union Bank*, 411 A.2d at 1342.  He cannot come forward now, years after the case was settled, and ask the Court to re-open the litigation on the basis of such allegedly-omitted evidence.  *Cf. NMD Interactive, Inc. v. Chertok*, 2013 WL 1385213, at *10 (S.D.N.Y. Mar. 18, 2013) ("Defendant took no steps to compel disclosure of documents that he knew existed, and then he waived any objections to Plaintiff's production by settling.") (citing *United States v. Bank of New York*, 14 F.3d 756, 759 (2d Cir. 1994)).[5]  The motion for leave to amend is therefore DENIED.

---

[5] Moreover, the remedy Dr. Long seeks in his amended claims – damages beyond what he received in the 2008 settlement – appears to be inconsistent with Vermont law.  In *Caledonia Sand and Gravel Co. v. Joseph A. Bass Co.*, 151 A.2d 312, 314-15 (Vt. 1959), the Vermont Supreme Court held that "[i]n this State it may be regarded as a general rule that when one has received anything of value in settlement of a right of action, the contract of settlement, although obtained by duress and fraud, is a bar to a recovery at law so long as it is not rescinded by an offer to return the consideration in so far as it lies within his power to do so."  Under *Caledonia Sand and Gravel Co.*, Dr. Long may not retain the benefit of the 2008 settlement and bring litigation for additional amounts that he might (or might not) have received.

## Conclusion

For the reasons set forth above, Defendants' motion to dismiss (ECF 17) is GRANTED and Dr. Long's motion to amend (ECF 32) is DENIED.  Defendants' motion for an extension of time in which to move to strike (ECF 19) is DENIED as moot.  This case is DISMISSED.

Dated at Burlington, in the District of Vermont, this 5th day of May, 2014.


/s/ William K. Sessions III
William K. Sessions III
District Court Judge